IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| DAVID J. ANNARELLI, | ) | |
| Plaintiff, | ) | Civil Action No. 7:20-cv-00261 |
| | ) | |
| v. | ) | |
| | ) | By: Elizabeth K. Dillon |
| HAROLD W. CLARKE, *et al.*, | ) | United States District Judge |
| Defendants. | ) | |

**MEMORANDUM OPINION**

*Pro se* plaintiff David J. Annarelli, an inmate in the custody of the Virginia Department of

Corrections (VDOC), brought this civil rights action asserting claims pursuant to 42 U.S.C. § 1983

against a number of defendants.  He claims that defendants violated his Eighth and Fourteenth

Amendment rights by being deliberately indifferent to his medical needs.[1]  In general terms,

Annarelli complains that he suffered a traumatic brain injury (TBI) in 2011, prior to his

incarceration, which was exacerbated in 2016 during the incident that led to his arrest.  He claims

that defendants were deliberately indifferent to his continuing medical needs stemming from those

injuries, including a need for psychiatric treatment.  He also claims that defendants were

deliberately indifferent to injuries and possible further exacerbation of his TBI as the result of an

incident on January 20, 2019.  On that date, he was involved in an altercation with another prisoner,

was temporarily unconscious, and he received—and was treated for—a cut on his scalp.

In addition to insisting that he should be referred to an outside medical provider for

treatment of ongoing symptoms from his TBI, Annarelli also asked one or more of the defendants

for a single-cell assignment or for a transfer to a facility that he believed was better equipped to

---

[1] Although Annarelli's complaint references the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101
*et seq.*, in the context of explaining why defendants were deliberately indifferent, he does not appear to be asserting a
separate claim under that statute.  Furthermore, defendants do not interpret his complaint as including a separate claim
under the ADA, and he does not dispute their characterization of his claims.  Thus, the court does not construe his
complaint as asserting a separate ADA claim.

address his needs.  Neither of those requests have been granted.

Addressed in this opinion are three separate motions for summary judgment.  The first was filed by defendants Harold W. Clarke, Kevin Punturi, S. Yates, T. Heffinger, C. Smalling, and K. Crowder (collectively the Correctional Defendants).  The second motion was filed by the two remaining defendants—Dr. Mullins and Murphy (collectively the Medical Defendants).  The third motion was filed by Annarelli.  The motions are fully briefed and ripe for disposition.  For the reasons set forth herein, the court will grant defendants' motions for summary judgment and will deny plaintiff's motion.

## I.  FACTUAL BACKGROUND

### A.  Summary Judgment Record

In setting forth the factual background underlying Annarelli's claims, the court relies on the affidavits of Punturi, Herald, Dr. Mullins, and Murphy, as well as the exhibits attached to each, which include Annarelli's medical records and documents related to his administrative grievances. The court also treats the factual averments in Annarelli's verified complaint, if based on personal knowledge, as facts in opposition to summary judgment.  *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (explaining that verified complaints by *pro se* prisoners can be considered as affidavits in opposition to summary judgment when the allegations contained therein are based on personal knowledge).  And the court has considered the documents attached to Annarelli's complaint, which include documents previously described by the court as the "Bender Report" and the "Brown Declaration."  (Sept. 30, 2021 Mem. Op., Dkt. No. 42.)[2]  *See also infra* at Section I.C.1 (describing both).

---

[2]  The court's September 30, 2021 opinion was authored by United States District Judge Thomas T. Cullen, who presided over this case from September 2020, when it was transferred to him, until it was transferred to the undersigned on January 10, 2022.

Neither of Annarelli's responses to the summary judgment motion is verified, however, and he does not include any affidavits, either by him or anyone else.  The statements in his response briefs are not considered evidence in opposition to summary judgment.  *See United States v. White*, 366 F.3d 291, 300 (4th Cir. 2004) (holding that "unsworn argument does not constitute evidence" for purposes of summary judgment).  As it must, the court construes all facts in the light most favorable to Annarelli.

**B.  The Parties and Annarelli's Allegations Against Each Defendant**

Annarelli was housed at Pocohontas State Correctional Center (PSCC) at all pertinent times. Defendant Harold Clarke is the Director of VDOC, and Punturi is the Warden of PSCC.

Defendant Yates, at all relevant times, was employed as the Institutional Health Authority at PSCC.  Annarelli asserts that Yates was responsible for proper record-keeping and coordinating treatments requested in the medical department.  He claims that she was "negligent" because it took 15 months to obtain some of his medical records.

Defendant Heffinger was the Americans with Disabilities Act (ADA) Coordinator at PSCC until December 31, 2019.  Thereafter, he was a Correctional Officer.

The other two Correctional Defendants were involved in responding to some of Annarelli's grievances or grievance appeals.  The first, Smalling, is the Institutional Grievance Coordinator at PSCC, and Crowder is the Regional Ombudsman for VDOC's Western Region.

Dr. Mullins is a physician who worked at PSCC from approximately 2017 to 2020.  He never saw Annarelli for a medical appointment, a fact supported by Annarelli's medical records. (Mullins Decl. ¶ 8, Dkt. No. 66-1.)  Annarelli's complaint, however, asserts that he met with Dr. Mullins, who allegedly said, "In my 35 years at the Emergency Room I've never heard of behavioral changes or mental health issues because of head injuries."  (Compl. 3, Dkt. No. 1.)  Dr. Mullins then "went on to silence Mr. Annarelli" and have him sign an open-ended medical release

paper. (*Id.*)  Annarelli claims that Dr. Mullins not only lacked medical knowledge, but also lacked any interest in his well-being.  (*Id.*)

Murphy is a Psychologist Associate II at PSCC.  He is not a physician and does not possess the necessary education, training, and experience to diagnose, treat, and care for TBIs or other head injuries.  (Murphy Decl. ¶ 43, Dkt. No. 66-1, at 6–14.)  Murphy met with Annarelli approximately ten times over the course of about two years.  In contemporaneous notes of these visits, Murphy describes these interactions and records both his own observations and Annarelli's self-reports about his mental health.  Annarelli claims that he repeatedly asked Murphy (in person and on a form called a "Request for Services") to contact Dr. Brown to acquire Annarelli's medical records.  He alleges that Murphy failed to obtain the records.  Annarelli also accuses Murphy of lying to him when Annarelli requested a transfer to a different facility.  Murphy allegedly told him that he did not have any say in where an inmate would be transferred or whether the request for a transfer is approved.  But Annarelli points to VDOC Operating Procedure 730.1, §§ IV-7, V-5, which he says show Murphy was able "to intervene regarding transfer."  (Compl. 3.)[3]

Annarelli further claims that Murphy knew of his head injury during the January  20, 2019 altercation, and should have referred him "promptly" to see Dr. Brown or initiated a transfer to another facility after that incident.  He also asserts that Murphy should have been aware that Annarelli's "mental health issues" are disabilities under the ADA.  (Compl. 4.)

**C.  Medical Evidence**

Annarelli's medical record with VDOC has been provided as an exhibit and also was reviewed and summarized in the affidavit of E.M. Herald, RNCB.  Although his medical record did

---

[3]  That policy, which is attached in its entirety to the Medical Defendants' motion for summary judgment, makes clear that a multi-disciplinary team of individuals would have to approve any transfer to another institution for mental health reasons.  *See* OP 730.1, "Mental Health Services: Administration" § IV.A.7, ECF No. 66-1, at 64.  That team could include a Psychology Associate, however.  So, Murphy may have been able to have input into a transfer decision, but clearly could not effectuate Annarelli's transfer on his own.

not include them, Annarelli attached to his complaint several documents referencing his TBI, including two documents created in 2019, apparently in conjunction with his criminal and post-conviction proceedings: the Bender Report and the Brown Declaration.  The court discusses them briefly and then turns to the treatment Annarelli received while at PSCC.

### 1.  The Bender Report and Brown Declaration

As described by the court in its prior opinion, the Bender Report is a "2019 neuropsychological report" prepared by Scott D. Bender, Ph.D., Associate Professor & Board-Certified Clinical Neuropsychologist at the University of Virginia Institute of Law, Psychiatry and Public Policy.  (Sept. 30, 2021 Mem. Op. 2, Dkt. No. 42.)  According to that report, "Annarelli suffered a [TBI] in 2011 when he jumped out of a moving car.  (*See* Bender Rep., Compl. Ex. A [ECF No. 1-1.])  After the accident, Annarelli suffered severe headaches and possibly behavioral changes."  (*Id.* at 2–3.)

The report summarizes information from various sources, including the declaration of Dr. Brown, who did not evaluate Annarelli but played in a band with him prior to his 2016 arrest.  Dr. Bender concludes that "Annarelli has longstanding and significant neuropsychiatric symptoms that impact his attention span, impulse control, mood, memory, and decision-making."  (Bender Rep. 14.)  It further states that "his symptoms were severe in and around the time of the offense," in 2016.  (*Id.* at 15.)  At that time, "he very likely required pharmacological treatment for his symptoms, but was unmedicated."  (*Id.*)  Elsewhere, it discusses Annarelli's violations of rules as "more appropriately understood as a consequence of his inadequately treated psychiatric symptoms rather than a characterological inclination toward antisocial behavior."  (*Id.* at 16.)  Dr. Bender offers his opinion that "Annarelli meets diagnostic criteria for bipolar disorder, depression, ADHD, and personality change due to TBI," and "that his pre-existing psychiatric symptoms were significantly exacerbated by his TBI in 2011 and concussion on the night of the offense [in 2016]."

(*Id.*)  The Report does not recommend any treatment or any particular treatment, nor is it focused on Annarelli's present-day symptoms.  (*See generally id.*)  Importantly, it offers no opinion as to whether Annarelli's treatment at PSCC has been adequate or whether he requires additional treatment.

According to the complaint, Annarelli received the Bender report in June or July of 2019. He presented it to Murphy, who read through it, but decided not to add it to Annarelli's VDOC mental health record.  (Compl. 7.)

Judge Cullen's opinion also described the Brown Declaration, a declaration of Ralph Brown, M.D., dated April 8, 2019, which was offered in support of Annarelli's habeas corpus petition:

> Brown practices in the field of neurotrauma treatment at the rehabilitation center for Carilion Clinic, treating trauma and brain-injury patients in Southwestern Virginia. Although Brown is not Annarelli's treating physician, Brown knows Annarelli through their mutual participation in a band—which met weekly for practice sessions—and other social interactions. Brown reviewed Annarelli's hospital records from the 2011 brain injury and has offered his observations regarding Annarelli's behavioral issues and how Annarelli's brain injury may have caused certain behaviors.

(Sept. 30, 2021 Mem. Op. 3–4.)  Like the Bender Report, the Brown Declaration does not contain any recommendations or suggestions for treatment, nor is it focused at all on Annarelli's condition while incarcerated.

## 2.  Provision of medical care at PSCC generally

The Commonwealth of Virginia provides trained medical and mental health care professionals to provide medical and mental health care at correctional facilities, and inmates should seek treatment at their assigned facility.  They may seek care by submitting a sick call slip or a Request for Services form.  The health care providers at PSCC evaluate the inmate's complaint and determine what treatment, if any, is necessary.  (Punturi Aff. ¶ 8, Dkt. No. 59-1.)  None of the Correctional Defendants have any responsibility or supervision over the actual administration of

medical or mental health services provided by the health care providers. (*Id.* ¶ 7.) Instead, Punturi and the other Correctional Defendants rely on the professional judgment of doctors, nurses, and other health care providers. Thus, they do not substitute their own judgment for the health care providers' professional opinions concerning an inmate's condition or treatment. (*See id.* ¶ 11.) Punturi avers that, in responding to Annarelli's grievances, he consulted medical staff, and that he has no reason to believe that Annarelli's medical needs were not appropriately addressed.[4]

### 3. Annarelli's medical treatment

According to Annarelli's medical records, he arrived at PSCC on March 23, 2018. His medical records from VDOC indicate a history of post-traumatic stress disorder (PTSD) and a traumatic brain injury (TBI) from 2011. (Herald Aff. ¶ 4, Dkt. No. 59-2 & Encl. A.) The records do not reflect that any medical provider at PSCC or within VDOC has opined that Annarelli requires special accommodations or that he should be evaluated by an outside provider for either of these issues. Moreover, although Annarelli states in his verified complaint that he "had previously reported to the medical staff at . . . PSCC that he was experiencing headaches, light & sound sensitivity," he does not provide details about to whom he reported those symptoms or when, and his medical records do not include the report of any such symptoms.

Annarelli sought treatment for a "cracked tooth" in July 2018 and was referred to a dental provider. (Dkt. No. 59-2, at 12.) On January 20, 2019, Annarelli was involved in an altercation with another inmate and was assessed by medical staff afterward. (Herald Aff. ¶ 5.) Medical staff

---

[4] In his opposition, Annarelli questions Punturi's credibility. (Opp'n to VDOC Defs.' Mot. Summ. J. 3.) He points out that Punturi had responded to a grievance of Annarelli's in July 2019, in which Annarelli had mentioned his TBI and requested referral to a specialist for a TBI. Then, in his affidavit submitted to this court, Punturi states that he had "no knowledge of Annarelli's claims regarding TBI." (Punturi Aff. ¶ 7.) The court does not make credibility determinations at the summary-judgment stage of the case. But the court discounts Punturi's testimony about when he learned about Annarelli's requests for treatment of his TBI because this is a disputed fact and the court must view all inferences in a light most favorable to the non-moving party. Annarelli has not provided evidence to contradict Punturi's testimony as to other aspects of the case, however. Moreover, the fact that Punturi learned of Annarelli's TBI in July 2019 does not alter the court's conclusion that he is entitled to summary judgment on Annarelli's Eighth Amendment claim.

cleaned a laceration on his scalp and applied a triple antibiotic ointment to it.  (*Id.*)  Additionally, and although Annarelli now claims that he was unconscious at some point during the altercation and believes he suffered a concussion, the medical notes from that encounter say that Annarelli stated "that he is certain that he did not hit the back of his head."  (Dkt. No. 59-2, at 13.)  He was not diagnosed with a concussion and no additional treatment was advised or given by any medical provider that evening.

Annarelli was advised to return to the medical department, however, if he had any worsening or persistent symptoms.  The record indicates no further complaints regarding that injury.  (Herald Aff. ¶ 5.)  Annarelli spent three days in a restricted housing cell assignment pending review of the incident, but he was released back to his general population housing assignment on January 23, 2019.  (Punturi Aff. ¶ 6.)

On May 6, 2019, Annarelli submitted an offender request stating that the institutional psychologist, Murphy, had recommended that he speak with a doctor regarding his complaints of TBI.  (Herald Aff. ¶ 6.)  He was placed on the sick call list, and his records reflect that he was seen in the medical department on May 8, 2019.  (Dkt. No. 59-2, at 11.)  The nurse's notes from that visit indicate that Annarelli said he wanted his medical records obtained by PSCC and that he needed a medical release form.  The nurse stated that she would put him on the list to see a doctor and would speak to the doctor about the release form.  (*Id.*)

On May 21, 2019, Annarelli's records reflect that he was in the medical department to sign a release to obtain records from both Ashville Memorial Hospital (related to his 2011 TBI) and Carilion Clinic.  Although the rest of the provider's entry is not entirely legible, it appears to contain a reference to his reporting a "long history of not being treated" and complaints about a "loss of memory or awareness" that led to "legal problems."  (Dkt. No. 59-2, at 10.)  Thereafter, records

were received and reviewed by the institutional physician.[5]  (Herald Aff. ¶ 7.)  On October 10, 2019, Annarelli refused to be seen by the institutional physician.

Annarelli filed this lawsuit in April 2020.  After receiving notice of the lawsuit, Punturi discussed the lawsuit with VDOC's ADA Coordinator.  (Punturi Aff. ¶ 5.)  The Coordinator directed Punturi to have Annarelli examined by the institutional physician and evaluated for any possible ADA accommodations.  On July 20, 2020, Punturi was told that the institutional physician would review Annarelli's medical record.  Punturi was informed later that same day that Annarelli had refused to be seen by the doctor because he wanted to be seen by Dr. Brown.  Annarelli's medical records also reflect that  Annarelli said he would not see the institutional physician because he was engaged in an ongoing lawsuit against PSCC.  (Herald Aff. ¶ 9.)

Annarelli expressed elsewhere that he wants to be seen by the doctor of his choice, Dr. Brown.  (Punturi Aff. ¶ 5.)  Annarelli disputes this, claiming instead that he wants to be seen by a physician who specializes in the treatment of TBIs, but not by any particular physician.  (Annarelli Opp'n to VDOC Defs.' Mot. Summ. J. 4–5, Dkt. No. 62.)  His verified complaint, however, repeatedly states that he wants to be evaluated by Dr. Brown.

Herald avers that if a member of the medical or mental health staff determines that Annarelli requires medical or mental health treatment that is unavailable at PSCC, then appropriate measures will be taken to accommodate those needs.  (Herald Aff. ¶ 10.)  Likewise, Dr. Mullins states that he "routinely" refers patients to outside specialists when medically necessary.  (Mullins Aff. ¶ 19, Dkt. No. 66-1.)

---

[5]  The copy of the medical records provided by defendants does not include any records from Dr. Brown.  It includes records from Ashville Memorial Hospital (related to the 2011 TBI) and Annarelli's treatment at Carilion Clinic, but not Dr. Brown's Declaration.  This makes sense, as Dr. Brown provided his declaration as Annarelli's friend and never personally treated Annarelli at Carilion Clinic.

### a. *Treatment by Dr. Mullins*

Dr. Mullins is a physician who worked at PSCC from approximately 2017 to 2020.  He never saw Annarelli for a medical appointment.  (Mullins Aff. ¶ 8, Dkt. No. 66-1.)  In October 2019, medical staff informed Dr. Mullins that Annarelli complained of a peanut allergy, and Dr. Mullins ordered a radioallergosorbent (RAST) test to determine if Annarelli had a peanut allergy.  (*Id.* ¶ 9.)  Annarelli refused to consent to the test.  (*Id.* ¶ 10.)  According to Annarelli, he did not need the test because he knew his medical history and knew he had an allergy.  (Pl.'s Opp'n to Med. Defs.' Mot. Summ. J. 2, Dkt. No. 69.)  In any event, Dr. Mullins never saw Annarelli personally for his peanut allergy, and Annarelli never sought further care or treatment from Dr. Mullins for his peanut allergy.  (Mullins Decl. ¶¶ 11, 12.)

The only other care Dr. Mullins provided to Annarelli was in conjunction with a March 2020 complaint by Annarelli reporting that he "felt something pop" around his ribs.  Another physician at PSCC ordered chest x-rays to rule out a left rib fracture.  Dr. Mullins reviewed the chest x-ray results when they were returned.  He advised Annarelli, through the PSCC mail system, about the results, telling Annarelli that his chest x-ray was "within normal limits and/or clinically insignificant."  (Mullins Decl. ¶ 15.)  As with the peanut allergy, Dr. Mullins never saw Annarelli personally for any complaints about his ribs, and Annarelli sought no further care or treatment from Dr. Mullins in conjunction with those complaints.  (*Id.* ¶¶ 16, 17.)

Dr. Mullins did not oversee or treat Annarelli for any TBIs or related symptoms, or for any head injury complaints.  (*See id.* ¶ 18.)

### b. *Treatment by Murphy*

Defendant Murphy, who is employed as a Psychology Associate II, saw Annarelli approximately ten times for counseling or mental health concerns over the two-year period from May 2018 to May 2020.  Rather than going into detail as to each of those visits, the court simply

highlights some of them.  In doing so, the court notes that the medical records show that Annarelli refused various types of mental health care treatment at different times.

On May 24, 2018, although his reported symptoms were consistent with depression and anxiety, Annarelli refused to consider any "psychotropic medication at this time."  In July 2018, Annarelli declined an offer to place him in an upcoming group session about coping with stress, and he also declined Murphy's offer to have him meet with a psychiatric consultant.

In April 2019, after it was discovered that Annarelli had written an anonymous blog post in which he said he was "tired of [getting] no proper psych help," Murphy went to see him.  After confirming that Annarelli wrote the post, Murphy reminded Annarelli that "he repeatedly declines offers to attend mental health group programming or to meet with the psychiatric consultant." Annarelli said that he felt "uncomfortable" with the group sessions and believed that he did not "belong with that group, convicts."  The notes from that session also indicate that Annarelli spoke at length about his belief that the medical department was not treating his TBI.  He acknowledged, though, "that he has not signed up for sick call to speak with the doctor regarding his concerns about a possible brain injury."  (Murphy Decl. ¶ 15 & Ex. 10, Dkt. No. 66-1.)

On or around April 24, 2019, Annarelli submitted an informal complaint in which he said that "information obtained on 4/23/2019 from Mr. Murphy (psychologist) . . . informed me that my medical record does not reflect the incident which I suffered a concussion when I was struck in the head by another offender."  (*Id.* ¶ 16.)  Murphy does not recall making any representations to Annarelli regarding specific details about the January 20, 2019 incident or what was referenced in Annarelli's medical records.[6]

On May 6, 2019, Murphy met with Annarelli and discussed a number of topics, including

---

[6] Despite Annarelli's characterization of the incident as resulting in a concussion, his medical records do not reflect that any medical personnel determined he had a concussion.  (*See* Dkt. No. 59-2, at 19.)  Also, as  noted, he was told to return for treatment if he had any worsening or persistent symptoms, and he did not do so.

his belief that he suffered a TBI years ago and the general substance of Dr. Brown's report, although Annarelli acknowledged never being examined by Dr. Brown.  Murphy again advised Annarelli to request medical treatment for the alleged TBI with PSCC's medical doctor.  Murphy also informed him that "his claims that his medical needs are not being addressed lose merit when he has made no effort to speak with the doctor here regarding them."  (*Id.* ¶ 19.)

On the same date as this session with Murphy, Annarelli submitted his first request to medical related to his TBI.  Specifically, on May 6, 2019, he filed a Request for Services form with the medical department about obtaining records related to his TBI.

Again in July 2019, Annarelli declined to participate in any mental health group programming, despite Murphy's recommendation that he do so.  Annarelli said that would "make this worse," and he expressed that what he needed was "regular and serious counseling for starters" and to see "Dr. Brown, not these doctors [regarding his possible TBI]."  (*Id.* ¶ 20 & Ex. 13.)

Despite his refusal to attend group therapy or to request an appointment with the psychology department, in many of his treatment sessions with Murphy, Annarelli discussed with Murphy events that were occurring in his life or upsetting to him and how he was feeling.  The notes of each meeting further reflect that Murphy reminded Annarelli of the process at PSCC to request mental health services, if Annarelli wanted to speak with a member of the psychology department.  (*See generally* Murphy Decl. & Exs.)

Annarelli had not requested an individual therapy appointment with the Mental Health Department since his visit with Murphy on May 8, 2020.  His records reflect that he also met with another Mental Health Department staff member on three occasions: on February 22, 2019, and February 7, 2021, for annual reviews initiated by the Department; and on January 11, 2022, at the request of Annarelli's attorney.  (*Id.* ¶ 23.)

Despite his expressed reluctance to group therapy, Annarelli participated in the "Coping

With Stress" weekly group program from July 20, 2019, until the program's completion on November 5, 2019.  (*Id.* ¶ 26.)  He did not participate in any other group therapy programs.  (*Id.* ¶ 27.)  Further, although Murphy believed Annarelli presented as a person who "may have benefitted from medication," which had to be obtained by talking to the psychiatric consultant, Annarelli repeatedly declined to speak with that consultant regarding any psychotropic medications to treat and manage his mental health concerns.  (*Id.* ¶¶ 29–30.)  Again, Annarelli offers an explanation for this in his opposition, saying that his father is a pharmacist, that he knows the dangers of certain psychiatric medicines, and that he did not trust the providers at PSCC to medicate him properly.  Regardless, he does not dispute that he refused and never sought out such treatment through the proper channels.

Murphy avers that PSCC could appropriately care for and treat Annarelli's mental health concerns, that his mental health needs have been and are being appropriately managed at PSCC, and that he did not require a transfer to a designated medical correctional facility.  (*Id.* ¶¶ 31–32, 39–40.)  Even if Annarelli is not receiving some mental health treatment that he desires (or which he thinks can only be provided elsewhere), he has failed to take advantage of the services offered at PSCC by failing to seek (and indeed, declining) a referral for potential prescriptions for mental health medications and has repeatedly declined to participate in group therapy sessions.  (*Id.* ¶¶ 28–30.)

Annarelli also complains in one grievance that Murphy did not transfer him to a different institution for mental health treatment, and he complains that he was not given a single cell assignment.  The record reflects that his request for a single-cell assignment was denied because he did not meet VDOC's criteria for such an assignment, and Annarelli nowhere explains how or why that decision was incorrect.  As to Annarelli's request for transfer, Murphy explains that he is not authorized to issue transfer requests for inmates residing in the general population and did not create

13

any policies concerning inmate transfers.  (*Id.* ¶¶ 33, 41.)

Instead, if an inmate requires in-patient psychiatric care or hospitalization due to substantial mental health needs, a "multidisciplinary team" must approve any such transfer.  (*Id.* ¶ 36.)  Such transfers are rare and usually temporary in nature.  (*Id.* ¶ 37.)  At no point did Murphy inform Annarelli that he was a candidate for transfer.  (*Id.* ¶ 38.)  Absent legitimate medical reasons for a transfer, the building counselor is the individual authorized to review and approve transfer requests. (*Id.* ¶ 34.)  Annarelli was informed of this in a response to a grievance on the issue.

### 4. Annarelli's grievances

As noted, on May 6, 2019, Annarelli submitted an Offender Request stating that Murphy had recommended that he speak with the doctor regarding his complaints of TBI.  (Herald ¶ 6.) Consequently, Annarelli was scheduled for sick call.  He was seen on May 8 and scheduled to be seen again on May 21, 2019.  (Punturi Aff. ¶ 4.)

In an informal complaint dated May 11, 2019, Annarelli states that he had been requesting, using a Request for Services form, that his medical records be obtained.  He claims that he had made multiple attempts, over 15 months, to acquire those records.  He then put in one more request, at Murphy's recommendation—and "strictly as a formality."  Specifically, on May 21, 2019, Annarelli signed a release of information form in order for PSCC to receive records from an outside medical provider, the Carilion Clinic, and the physician requested records from two different hospitals.  Those records were received and reviewed by the "institutional physician," who apparently was not Dr. Mullins, based on his affidavit.  (*Id.*; Herald Aff. ¶ 7; Mullins Decl. ¶¶ 18, 20.)

Annarelli was charged a $5 copay for that visit, but he contends he should not have been charged.  Specifically, he complained that he had never seen a physician on May 21, 2019, but had simply signed a release form.  He nonetheless had been charged a medical co-pay.  He filed an

informal complaint first and then a grievance.  (*See* Punturi Aff., Encl. A, Dkt. No. 59-1, at 5–6.)
He also pointed out that he used a Request for Services form to ask that the medical records be
obtained, not a sick call slip.

In response to his informal complaint, he was told that the charge was appropriate for any
offender-initiated request for sick call.  (Dkt. No. 59-2, at 40 (informal complaint and response); *id.*
at 42 (Request for Services form dated May 6, 2019).)  He then grieved the issue, but his grievance
was denied by Punturi because there was no indication that staff had refused to obtain records or
that Annarelli had been improperly charged a co-pay for his May 21, 2019 sick call appointment.
Annarelli appealed that response to Level 2.  (Punturi Aff. Exs., Dkt. No. 59-1, at 5–7; Punturi Aff.
¶ 4.)  On August 19, 2019, Smalling concurred with Punturi's response, deeming the grievance
unfounded.

Annarelli later filed informal complaints asking for a single cell assignment and
complaining about not being sent to see a TBI specialist.  Herald responded to those informal
complaints.  As to the first, she noted that Annarelli did not meet the criteria for single cell
assignments and told him to address housing concerns with his unit manager.  (Herald Aff. ¶ 8; *see
also* Dkt. No. 59-2, at 35.)  As to the second, she noted that he had not submitted a sick call slip to
discuss his request for a specialist.  (Herald Aff. ¶ 8; *see also* Dkt. No. 59-2, at 36–37.)  In a
separate response, she noted that Annarelli had signed up for sick call in May 2019, but when seen
he did not address the injury from January 2019 and that he had not requested a sick call visit since
May.  (Herald Aff. ¶ 8; *see also* Dkt. No. 59-2, at 37.)  She specifically advised him to "utilize sick
call procedures for any and all medical needs."  (Dkt. No. 59-2, at 37.)

Annarelli's complaint also contains a letter that appears to have been submitted in
connection with several appeals of his grievances, in which Annarelli describes a "further,
misdiagnosed head injury" that he received while incarcerated at PSCC when he "was attacked by a

cell mate, yanked from the top bunk, landing head first on concrete with enough force to render [him] immediately unconscious" in January 2019. (Compl. Ex. 3, Dkt. No. 1-3, at 19.)  In that document, Annarelli alleges that he was given only a cursory examination and that he should have been given a "more thorough examination." (*Id.*)  His complaint also alleges that he informed Murphy of the January 2019 incident, but that Murphy did not provide an appropriate response, such as arranging for a transfer to a facility better equipped to handle Annarelli's disabilities and/or his TBI-related injuries.

## II.  DISCUSSION

### A.  Summary Judgment Standard

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).[7]  A material fact is one that "might affect the outcome of the suit under the governing law."  *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of material fact is "genuine" if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party.  *Anderson*, 477 U.S. at 248–49.

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party makes this showing, however, the opposing party may not rest upon mere allegations or denials, but rather must, by affidavits or other means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c), 56(e).  All inferences must be viewed in a light most favorable to the non-moving party, but the nonmovant "cannot create a genuine issue of material fact through mere

---

[7] The court omits internal citations, alterations, and quotation marks throughout this opinion, unless otherwise noted.

speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

## B.  Fourteenth Amendment Claims

The VDOC Defendants' supporting memorandum discusses at length why any procedural or substantive due process claim fails.  (VDOC Defs.' Mem. Support Mot. Summ. J. 19–21.)  In his response, Annarelli has not responded at all to these arguments.  (*See generally* Dkt. No. 62.)  He has thus waived the issues and claims.  *See Cox v. SNAP, Inc.*, 859 F.3d 304, 308 n.2 (4th Cir. 2017) (explaining that where a party fails to advance an argument in its summary judgment papers, it has been waived); *Universal Life Ins. Co. v. Lindberg*, No. 1:20CV681, 2022 WL 1394960, at *5 (M.D.N.C. Mar. 31, 2022) ("When a party fails to respond to a summary judgment motion regarding a claim, the party essentially concedes that summary judgment in favor of the moving party is appropriate."), *report and recommendation adopted,* No. 1:20CV681, 2022 WL 1316588 (M.D.N.C. May 3, 2022).  Moreover, the court finds that defendants offer persuasive reasons as to why they are entitled to summary judgment as to Annarelli's due process claims.

## C.  Defendants' Motions for Summary Judgment on Eighth Amendment Claims

### 1.  Eighth Amendment Deliberate Indifference

"It is beyond debate that a prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment." *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019).  To demonstrate deliberate indifference, an inmate must show that (1) he has a medical condition that has been "diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention" and (2) the defendant "had actual knowledge of the plaintiff's serious medical needs and the related risks, but nevertheless disregarded them." *Id.* at 356–57.  The first component is an objective inquiry and the second is subjective. *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209–

10 (4th Cir. 2017).

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *Farmer v. Brennan*, 511 U.S. 825, 839–40 (1994). "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). To qualify as deliberate indifference, the health care provider's treatment "must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837.

It is well established, moreover, that mere disagreement with a prescribed course of treatment is insufficient to establish an Eighth Amendment claim of deliberate indifference. *See Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (finding that a prisoner's claim "is essentially a disagreement between an inmate and a physician over the inmate's proper medical care, and we consistently have found such disagreements to fall short of showing deliberate indifference") (internal quotations and alterations omitted). If a medical provider has a legitimate medical reason for a certain course of treatment, an inmate's disagreement with the treatment is not sufficient to succeed on an Eighth Amendment claim. *Rush v. Vandevander*, Civil Action No. 7:08CV00053, 2008 WL 495651, at *2 (W.D. Va. Feb. 21, 2008); *see also Taylor v. Barnett*, 105 F. Supp. 2d 483, 488 (E.D. Va. 2000).

### 2. Generally

The court will address the defendants' motions by addressing the Eighth Amendment claims against each defendant. First, though, the court notes an important conclusion common to claims against all defendants. Specifically, Annarelli's Eighth Amendment claims are significantly undermined by his own failures, at least since May 2019 when his outside records were received, to follow the VDOC process of submitting a sick call slip and requesting additional treatment or an

outside referral.  To be sure, Annarelli told several people—Murphy in person and others in grievances—that he had suffered a TBI in 2011, and he referenced other possible head injuries in 2016 and on January 20, 2019.  He also told Murphy in sessions and others in grievances that he wanted to be seen by Dr. Brown, a specialist in treating TBIs.  But the record before the court clearly shows that, in response to such statements, Annarelli was repeatedly told to submit a sick call request to speak with a physician so that he could obtain a referral to a specialist or additional treatment.  Murphy told him this, Herald told him this in her grievance responses, and he was told this in response to other grievances, as well.  Instead of following that simple instruction that he was repeatedly given, he elected to refuse treatment by physicians at PSCC and to insist that he could not receive proper treatment from them.

Critically, he has presented no evidence that he submitted a sick slip after May 2019, when his records from 2011 referencing the TBI were obtained, and there is no evidence that anyone failed to see him in the medical department after any such request.  And his general statements that he complained about headaches and other symptoms do not overcome the absence of any such notations in his medical records, particularly where he has failed to allege when or to whom he made such complaints.

Even if Annarelli is correct and he needs treatment by an outside specialist, he still had to be referred to an outside specialist by a PSCC physician, who had to examine him first and determine whether additional treatment was warranted.  But prior to the May 8, 2019 appointment where he says he discussed his TBI with Dr. Mullins (although it was apparently a different medical provider), there is no reference in the medical records of him submitting a sick call request to be seen or treated for any symptoms of a TBI.  And after May 21, 2019, when the records were requested—through the filing of his lawsuit and even up until the summary judgment filings—there is ample evidence that he still refused to be seen by a PSCC provider or to submit a sick slip to be

19

evaluated for a possible referral.  By repeatedly failing to take the one step that could have led to

what he wants, he has not shown that any medical personnel with the ability to give him the relief

he wants were even told of his request for treatment.  *See Boblett v. Angelone*, 957 F. Supp. 808,

814 (W.D. Va. 1997) ("Clearly, a delay precipitated by plaintiff's own actions does not amount to

deliberate indifference on the part of the [defendants].").

 Annarelli seems to be under the impression that the existence of records documenting his

TBI should have led to a flurry of activity, initiated by Murphy or by the medical staff.  Indeed,

Annarelli seems to believe that PSCC physicians (or other medical staff) should review every

inmate's medical record to make a determination as to whether or not treatment is needed,

regardless of whether the patient complains about anything.  But that is not the Eighth Amendment

standard.  Nor is it the proper VDOC process to be used for inmates requesting medical care.

Inmates are required to submit a sick call slip or Request for Services form to be seen.  And, as

Murphy repeatedly advised, Annarelli could seek further psychiatric care by requesting a

psychiatric consult over medicine or by participating in offered group therapies, neither of which

did.

 As defendants point out, there is nothing in his 2011 records, or in the Bender Report or the

Brown Declaration (even if they had been part of his medical record—which they were not), that

states that any particular type of medical treatment is required or that Annarelli should be seen by a

specialist.  And regardless, it is not incumbent upon medical providers to search through every

inmate's records to find a possible complaint that might need to be addressed.  The mere fact that

there is a reference in an inmate's medical record to a TBI years before does not tell a medical

provider that an inmate is currently suffering with any symptoms of that TBI.  And to be

deliberately indifferent, the medical personnel must have *actual* knowledge that a plaintiff is

suffering from a serious medical need that requires treatment, and then fail to provide that

treatment.

Moreover, as is evident from the description of Annarelli's medical records, not only did Annarelli fail to seek out a referral from a medical provider to an outside specialist, but Annarelli repeatedly *refused* medical treatment or mental health treatment that was offered to him. Annarelli's opposition to the summary judgment motion begins by explaining why he did not want the allergy test offered by Dr. Mullis and why he did not seek further treatment for his rib injury. Because he had good reasons for these refusals, he contests the "false narrative" that he refused necessary medical treatment.  (*Id.*)  He also claims that the person running the one group therapy he attended, the other inmates there, and even Murphy shared his view that the VDOC policy and lack of mental health care was "the problem." (*Id.* at 3–4.)

He also contends that he declined to take medication as an educated decision, based on his knowledge shared by his father, a pharmacist for "some 45 years." (*Id.* at 4.)  He says he is willing to be on medication, but not while in custody, because he did not want to be "subject to the whims or policies of a DOC with a god-awful track record . . . ." (*Id.* at 5.)  He expressly states that he "stopped engaging the mental health staff at PSCC," which supports the conclusion that he declined treatment.

Then, in a seemingly contradictory statement, Annarelli clarifies that he has, in fact, requested mental health support since completing the "Coping With Stress" program in November 2019, although he does not identify any specific instances of doing so.  (*Id.* at 3–4.)  He also points out that he was cooperative when mental health staff came to see him at the request of someone else.

In sum, the record does not reflect a good faith attempt by Annarelli to properly request medical or mental health care, and it reflects frequent refusals of care.  Although he argues those refusals were justified, they undercut his claim that he kept seeking treatment.  In addition to these

problems with his claims (which are relevant as to all defendants), the court discusses next the additional reasons why each defendant is entitled to summary judgment in his or her favor.

### 3. Defendant Yates

Annarelli faults defendant Yates for delaying in obtaining his medical records, which he claims took 15 months. It is true that Annarelli arrived at PSCC in March 2018, and the outside medical records were not ordered until May 2019, after he submitted a sick call request and asked the medical department to obtain them. Based on the documents, it appears that they were received by PSCC at the end of June 2019. (*See, e.g.*, Dkt. No. 59-2, at 45, 65.) Annarelli states—in one of his informal complaints—that he had been trying to obtain the records that entire time, but nowhere does he give any specifics about when, or to whom, he directed those supposed requests. The documents before the court reflect that the first time he asked for those records to be obtained was in May 2019. Even if the delay in obtaining the records was negligent, Annarelli has not shown that Yates—or anyone else—failed to retrieve them out of deliberate indifference to a serious medical need. Nor has he shown any harm to him as a result of the delay. Indeed, even after the records were received, no physician or other medical provider at PSCC has yet determined that he needs additional treatment.[8] Thus, it is unclear what benefit it would have been to Annarelli had PSCC obtained them sooner.

Because Annarelli has not shown that Yates was deliberately indifferent toward any serious medical need or that she violated his Eighth Amendment rights, Yates is entitled to summary judgment in her favor.

### 4. Defendants Smalling and Crowder

Annarelli asserts that defendants Smalling and Crowder violated his Eighth Amendment rights through their responses to his grievances, or by failing to properly process certain grievances.

---

[8] Again, though, he has failed to request that treatment from a medical doctor.

22

For several reasons, no reasonable jury could find that Smalling or Crowder violated Annarelli's constitutional rights.  First of all, they responded with accurate information, and both of them, just as Murphy did, advised Annarelli that if he wanted to see an outside specialist, or wanted treatment for symptoms resulting from his earlier TBI, he needed to submit a sick call request and speak with a doctor about it.

Moreover, these two individuals are not medical doctors, and the undisputed evidence is that their role in the grievance process is an administrative one.  As noted, they could not dictate medical treatment for Annarelli.  Based on the facts here, then, the court agrees that their role in processing Annarelli's grievances cannot give rise to an Eighth Amendment violation.  As another judge of this court recently explained, "a prison official's act of responding to a grievance generally does not cause or contribute to a constitutional violation . . . particularly" when the grievance complained of past or completed misconduct.  *Hoglan v. Robinson*, No. 7:16-CV-00595, 2022 WL 909041, at *2 (W.D. Va. Mar. 28, 2022) (citing *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007)).  When a grievance alleges an ongoing violation of an inmate's right, however, and the official reviewing the grievance has the power to remedy it, then that official may be liable for a constitutional violation.  *Id.* at *2–*3 (citing *Wright*, 766 F.2d at 850).

Here, as noted, some of Annarelli's grievances alleged an ongoing lack of medical care, but there is no evidence from which a jury could conclude either that Smalling or Crowder could order or dictate medical treatment for Annarelli.  Without their having any authority to remedy the problem, they cannot be held responsible for a constitutional violation.

The court will grant summary judgment in their favor.

### 5.  Defendant Heffinger

As for defendant Heffinger, PSCC's ADA Coordinator, Annarelli apparently seeks to hold Heffinger liable for failing to provide services and support for an inmate, like him, with a disability.

He does not allege any other personal involvement or conduct by Heffinger.  Critically, though, Annarelli points to no evidence that any PSCC medical personnel required an accommodation for him.  Nor does he show that Heffinger knew of any accommodation needed or medical treatment recommended by any PSCC medical provider and failed to follow that recommendation.  Thus, there is simply no evidence that Heffinger knew of and disregarded an excessive risk to Annarelli's health or safety.  *See Farmer*, 511 U.S. at 837.  Heffinger is entitled to judgment as a matter of law as to Annarelli's Eighth Amendment claim.[9]

### 6. Defendants Clarke and Punturi

Annarelli's claims against Clarke and Punturi are similarly infirm.  Clarke is the Director of VDOC, and Punturi is PSCC's warden.  Neither is a medical doctor, and neither is qualified to make medical decisions regarding the diagnosis or treatment of an offender's medical needs.  As the Fourth Circuit has explained, "a nonmedical prison official can generally defer to the decisions of prison medical personnel at the institutional level."  *Gordon*, 937 F.3d at 358.  Thus, where "a prisoner is under the care of medical experts, . . . a nonmedical prison official will generally be justified in believing that the prisoner is in capable hands."  *Iko v. Shreve*, 535 F.2d 225, 242 (4th Cir. 2008).

In certain circumstances, claims against a nonmedical person in this context can go forward.  One such situation is where a prisoner is complaining about a lack of medical care and has not received any medical treatment whatsoever.  *Iko*, 535 F.3d at 242.  In *Iko*, for example, the plaintiff

---

[9] As noted *supra* note 1, the court does not construe the complaint as including an ADA claim.  But to the extent he is raising one, he has not presented sufficient evidence from which a jury could find in his factor on such a claim.  To prevail on an ADA claim under Title II, applicable to state prisons, *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998), Annarelli must show that "(1) he has a disability; (2) he is otherwise qualified to receive the benefits of a public service, program or activity; and (3) he was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of his disability." *Spencer v. Early*, 278 F. App'x 254, 261 (4th Cir. 2008) (quotation omitted).  Annarelli has not identified any specific program or activity from which he has been excluded and if his complaint is that he was denied medical treatment, that does not result in liability under the ADA.  *See Burger v. Bloomberg*, 418 F.3d 882, 883 (8th Cir. 2005); *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996); *see also Spencer v. Easter*, 109 F. App'x 571, 573 (4th Cir. 2004).

had been pepper sprayed and not given decontamination, and officers walked him to a nearby medical room.  There, a nurse explained that she was there to offer medical treatment, but plaintiff did not respond at all, so she offered no treatment and did not physically examine him at any point. *Id.* at 232.  A minute later, the officers saw him collapse and directed him to a wheelchair, but they kept him restrained and in his pepper-spray-saturated clothing and spit mask.  *Id.*  The Fourth Circuit concluded that the officers could not rely on the nurse's apparent decision *not to treat* the plaintiff, particularly when he was simply silent in the face of questioning and suddenly collapsed a moment later.  *Id.* at 242–43.

In *Gordon*, the court concluded that summary judgment was improperly granted to VDOC's medical director.  This individual reviewed and enforced the guidelines that prevented the plaintiff from getting treatment, consented to the suspension of treatment at another time, and failed to do anything in response to the plaintiff's grievances about the lack of treatment, despite knowing that the treatment guidelines prevented plaintiff from receiving that treatment.   The court held this was sufficient personal involvement in the denial of treatment to allow the claims against him to go forward.  *Id.* at 359.

To be sure, the grievances denied by Punturi and any failure to respond by Clarke concerned the same complaints Annarelli raises in this case.  For example, he submitted grievances complaining that it took a long time to get his medical records, that he was charged for a non-visit, and that PSCC failed to provide him with a single cell in response to his mental health needs.  In at least one grievance, he complained that no provider at PSCC had referred him to a specialist for treatment of his TBI and related issues.

But this case is distinguishable from both *Iko* and *Gordon*, and it falls squarely within the category of cases where nonmedical personnel *are* entitled to rely on medical providers for treatment decisions.  Here, Punturi discussed Annarelli's grievance with medical personnel and

determined that he had been seen by a physician, the medical records he wanted had been requested and reviewed, and that no further treatment orders had been entered by any physician.  It was not Punturi's role—or Clarke's—to determine that something additional should have been done by a physician or that more treatment was warranted.  Instead, they were entitled to defer to the PSCC physicians.

Moreover, as discussed above, the responses to Annarelli's grievances advised him repeatedly what he needed to do in order to receive medical care or to be referred to a specialist— put in a sick call request to see a PSCC physician and discuss his request to see an outside physician.  He requested care in May 2019, met with a provider and requested that his medical records be obtained, which they were.  A physician reviewed them and apparently concluded that no additional follow-up was needed.  Thereafter, Annarelli never followed up with any other or ongoing complaints.  He has presented no evidence that he subsequently submitted a sick call request concerning ongoing needs related to his TBI, or that he submitted a sick call request asking for a referral to a specialist.  There is an orderly process to be followed to request medical care, including outside care.  He was made aware of it via policies, and he was told repeatedly what he needed to do.  The record in the case shows that he failed to follow that process.  Instead, he submitted grievance after grievance.  It also is clear that Murphy told him repeatedly that he could ask to speak to a psychiatrist, could request medication, or could participate in group sessions if he believed they would be helpful.  Aside from participation in one group session, Annarelli never followed any of these avenues to receive additional mental health treatment.

Nor has Annarelli asserted facts sufficient to impose supervisory liability on either Clarke or Punturi.  To establish such liability, he would have to show that the defendant (1) "had actual or constructive knowledge that [a] subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff"; (2) that the defendant's

"response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,'"; and (3) that there was an "affirmative causal link" between the defendant's conduct and plaintiff's "particular constitutional injury." *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)). The court has reviewed the summary judgment record and easily concludes that the record contains insufficient evidence from which a reasonable jury could find these elements satisfied.

For the above reasons, Punturi and Clarke are entitled to summary judgment in their favor.

### 7. Defendant Dr. Mullins

Dr. Mullins notes, and Annarelli does not dispute, that Dr. Mullins never treated Annarelli. According to Dr. Mullins, this means that he cannot be held liable for an Eighth Amendment violation because defendant must "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. (*See also* Med. Defs.' Reply 3, Dkt. No. 70 (collecting authority for the proposition that a physician cannot be deliberately indifferent if he never treated the patient).)

For his part, Annarelli contends that is precisely the point. He interprets Dr. Mullins's affidavit as an admission that Dr. Mullins did "not treat[] Mr. Annarelli for a documented [TBI]" and did "not refer[] Mr. Annarelli to a specialist." (Resp. to Mot. Summ. J. 1, Dkt. No. 69.) He insists that Dr. Mullins was aware of facts that a substantial risk of serious harm exists from a failure to treat him, but he still refused to provide any treatment to Annarelli.

Annarelli claims that Dr. Mullins had actual knowledge of a problem because of Annarelli's "record of a brain injury, another head injury while in the custody of PSCC, [and] the reporting of multiple head traumas the night of his arrest." (Resp. to Mot. for Summ. J. 1 (citing to the Bender Report, "evidence of police assault now on file with the Fourth Circuit Court of Appeals," and New River Valley Regional Jail medical records from his booking stating that Annarelli was "covered in

bruises").)

Annarelli points to no evidence, however,  that Dr. Mullins was aware of any of these incidents or facts or that he had actually reviewed any of those records.  Moreover, as noted above, he never requested to be seen by a medical provider at PSCC to ask for outside treatment.  Thus, he has not presented evidence sufficient to find that Dr. Mullins had subjective awareness of Annarelli's assertion that he was having ongoing symptoms from his TBI.

Interestingly, moreover, Annarelli's own allegations about what Dr. Mullins said to him about TBI—although the records refute it was Dr. Mullins—suggest that to the extent he knew of the TBI, he did not believe there were ongoing symptoms to be treated.  Instead, he alleges that Dr. Mullins said he had "never heard of behavioral changes or mental health issues because of head injuries," but he requested Annarelli's older medical records anyway.  (Compl. 3, Dkt. No. 1.)  If Dr. Mullins had believed that Annarelli did not require treatment—even if that belief was wrong or negligent—then he was not deliberately indifferent.  Put differently, there is no evidence that Dr. Mullins "failed to provide care he himself felt to be necessary."  *See Jackson*, 775 F.3d at 178.  And negligence alone cannot support an Eighth Amendment violation.  *Webb v. Hamidullah*, 281 F. App'x 159, 166 (4th Cir. 2008) ("[N]egligent medical diagnoses or treatment, without more, do not constitute deliberate indifference.")

For all of these reasons, Dr. Mullins is entitled to summary judgment as to the Eighth Amendment claim against him.

### 8.  Defendant Murphy

Annarelli's claims against Murphy also fail.  First, to the extent Annarelli contends that Murphy has not adequately treated his TBI, that claim fails because Murphy is not a physician and does not have any education, training, or experience necessary for diagnosing and/or treating TBIs or other head injuries.  Moreover, each time that Annarelli complained to Murphy, Murphy advised

that he submit a sick call slip and ask to be seen in medical for treatment.  That Annarelli chose not to do so cannot be blamed on Murphy.

Annarelli also appears to fault Murphy for failing to provide him appropriate mental health care.  In his opposition, he specifically disputes paragraph 39 and 40 of Murphy's declaration, which relate to this claim.  These disputes, however, are not material and do not preclude summary judgment.[10]

In Paragraph 39, Murphy avers, "At no point did Annarelli display any behavior that suggested to me that his mental health needs could not be met at PSCC."  Similarly, paragraph 40 states that "Annarelli's mental health needs have been and are being appropriately managed at PSCC."  Annarelli disputes this, but offers nothing based on personal knowledge to show differently.  And given the fact that he declined repeatedly treatment that Murphy thought likely would be helpful, like medications, there is little—if any—basis for Annarelli's personal opinion that his needs could not be met.  And he cannot complain that his needs were not being met when he himself repeatedly refused various types of treatment offered, including medication and group therapy.  Furthermore, disputes between a health care provider and a patient over the proper course of treatment do not give rise to an Eighth Amendment violation.  *See Jackson*, 775 F.3d at 178.

Here, the undisputed facts do not reflect that Murphy was deliberately indifferent toward Annarelli's mental health needs.  Instead, the record reflects that Murphy repeatedly visited with Annarelli, as did other members of the mental health department.  Murphy encouraged him to join different group therapy sessions, offered him—and encouraged him to seek—a psychiatric consult for possible medications, and interacted with him providing talk therapy and counseling during their

---

[10] It is unclear whether Annarelli is referring to paragraph numbers in Murphy's declaration or in the statement of undisputed facts.  The court also has considered the same numbered paragraphs in the latter, and it concludes that Annarelli's disputes with these paragraphs are likewise not material and do not preclude the entry of summary judgment.

sessions.  Annarelli points to no specific time when he was not given treatment or when Murphy ignored or otherwise failed to refer him for mental health treatment.  In fact, as already discussed, Annarelli repeatedly declined additional mental health treatment.  Given the record as a whole, no reasonable jury could conclude that Murphy's conduct was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness."  *Miltier*, 896 F.2d at 851.

Murphy also argues that the Eighth Amendment claims against him fail because Annarelli offers no evidence to show that any failure to provide treatment by Murphy caused him any injury.  Pointing to a decision from another judge of this court, Murphy contends that "[w]hen a § 1983 claim for inadequate medical treatment involves a complicated health condition, expert testimony is required to show proof of injury."  (Med. Defs.' Reply 5 (citing *Hixson v Hutcheson*, No. 5:17cv32-L, 2019 WL 302516, at *4 (W.D. Va. Jan. 23, 2019), *aff'd sub nom. Hixon v. Moran*, 1 F.4th 297 (4th Cir. 2021).)

Murphy is correct that Annarelli offers no expert evidence to show that any failure to treat him while he was at PSCC resulted in any injury to him.  He relies heavily on the Brown Declaration and the Bender Report.  But the Brown Declaration is dated a full year before Annarelli filed his complaint and addresses his condition at the time of the events underlying his conviction, in 2016.  Similarly, the Bender Report (while undated) appears based on a clinical interview of Annarelli in 2019 and it, too, relates to Annarelli's condition in 2016.  Neither one makes any assertions whatsoever regarding appropriate treatment at PSCC, any alleged lack of appropriate treatment, or specifies any injuries or exacerbation of Annarelli's condition based on anything Murphy or anyone at PSCC id or failed to do.  Thus, neither constitutes an opinion that the treatment or lack of treatment at PSCC caused him some injury.  His Eighth Amendment claims fail for this reason, too.

Annarelli also complains that Murphy failed to transfer him to another facility.  In conjunction with this claim, Annarelli's opposition states that he specifically disputes Paragraph 36 of Murphy's affidavit.  Paragraph 36 explains that VDOC policy requires a multidisciplinary team to consult regarding the need for a transfer to another facility, and it is supported by the copy of the policy provided.  Annarelli has not produced any evidence based on personal knowledge to the contrary.  Moreover, there is no constitutional right to be housed at any particular facility.  *Pevia v. Hogan*, 443 F. Supp. 3d 612, 634–35 (D. Md. 2020) (collecting authority for the proposition that prisoners have no constitutional right "to be housed in a particular institution, at a particular custody level, or in a particular portion or unit of a correctional institution").[11]

In sum, because the undisputed facts show that he did not violate Annarelli's Eighth Amendment rights, summary judgment in Murphy's favor must be granted.

**D. Annarelli's Motion for Summary Judgment (Dkt. No. 55)**

As noted, Annarelli also filed his own motion for summary judgment, although his motion failed to comply with this court's local rules for such motions, which require that such a motion contain a "separately captioned section setting forth" the specific material facts that are undisputed, with record citations.  W.D. Va. Civ. R. 56(b).

Regardless of any procedural deficiencies or irregularities, Annarelli is not entitled to summary judgment for the same reasons that defendants are entitled to summary judgment in their favor.  For the reasons already explained, and even with facts construed in Annarelli's favor, defendants' summary judgment motions must be granted.  Obviously, then, in reviewing Annarelli's motion—which requires the court to construe the record *in defendants' favor*—Annarelli's claims cannot succeed.  *See Rossignol v. Voorhaar*, 316 F.3d 516, 522–23 (4th Cir. 2003) (explaining that

---

[11]  Annarelli also complains that Murphy read the Bender Report, but he declined to include it with Annarelli's mental health record.  Even if true, the court fails to see how this states a Eighth Amendment violation, and Annarelli does not explain it.

a district court faced with cross-motions for summary judgments generally should review each motion on its own merits, but that where summary judgment has been granted for one side, it "necessarily" meant the opposing party's motion must be denied).  Accordingly, Annarelli's motion for summary judgment will be denied.

### III.  CONCLUSION

For the reasons stated above, the court will grant defendants' motions for summary judgment and will deny plaintiff's motion for summary judgment.  An appropriate order will be entered.

Entered: September 20, 2022.

/s/ Elizabeth K. Dillon

Elizabeth K. Dillon
United States District Judge

32